**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

KELLY WILLIAMS,

               Plaintiff,

     v.

INSPIRA HEALTH NETWORK,

               Defendant.

---

Civ. No. 1:22-cv-00007-NLH-EAP

**OPINION**

**APPEARANCES**:

TIMOTHY STEVEN SEILER
ANDREW R. OLCESE
CHRISTA LEVKO
ARI R. KARPF
KARPF KARPF & CERUTTI PC
3331 STREET ROAD
TWO GREENWOOD SQUARE
SUITE 128
BENSALEM, PA 19020

     *Attorneys for Plaintiff*

DOUGLAS DIAZ
DANIEL JOSEPH DEFIGLIO
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE
HADDONFIELD, NJ 08033-0968

     *Attorneys for Defendant*

**HILLMAN**, District Judge

     Before the Court is Defendant's Motion for Summary Judgment

(ECF 40), Plaintiff's Motion to File a Sur-Reply (ECF 47), and

Plaintiff's Motion to Seal (ECF 50). For the reasons expressed

1

below, the Motion to File a Sur-Reply will be denied, the Motion for Summary Judgment will be granted, and the Motion to Seal will be denied without prejudice.

## I.    **BACKGROUND**

In September 2019, Plaintiff began working as a Licensed Practical Nurse ("LPN") at Inspira Medical Centers, Inc. ("Inspira" or "Defendant").  (ECF 40-2 and 45-2 at ¶¶ 1).  In this position Plaintiff worked at Inspira urgent care centers, including locations in Tomlin Station and Woolwich, New Jersey. (Id. at ¶¶ 2).

On July 3, 2020, Plaintiff filed an internal complaint against Dr. Andrew Pecora ("Pecora") alleging sexual harassment. (Id. at ¶¶ 9).  First, Plaintiff advised her supervisor, Darian Robbins, of the allegations over the telephone.  (Id. at ¶¶ 13; ECF 45-1 and 46-1 at ¶¶ 2).  Robbins instructed Plaintiff to put the complaint in writing, and that she would notify human resources.  (ECF 40-2 and 45-2 at ¶¶ 13).  During this conversation, Robbins was supportive of Plaintiff in making her complaint and did not discourage her from reporting.  (Id. at ¶¶ 14).

In her written complaint, Plaintiff explained that Pecora made "quite a few inappropriate sexual comments" to Plaintiff about her "'ass' and how good it looked," including that her "'ass' looks good bent over the desk."  (Id. at ¶¶ 16-17).  He

also touched her hair on both sides of her head and said "I like your hair like this." (Id.). Further, Plaintiff asked Pecora to examine her knee, and he stated "this would feel better with no clothes on." (Id. at ¶¶ 18).

Robbins forwarded the complaint to Director Stephanie Walker ("Stephanie Walker" or "Walker") as well as Chief Medical Officer Dr. Evelyn Balogun ("Balogun") for them to address with human resources. (Id. at ¶¶ 19). Balogun referred the matter to Human Resources Director, Trevor Haverluk ("Haverluk"). (Id. at ¶¶ 20). Within two or three days Haverluk met with Plaintiff to gather more information. (Id. at ¶¶ 21). During her conversation with Haverluk, Plaintiff also reported an incident where Pecora showed off a picture of himself in a Halloween costume that was "a reaper kind of . . . but when you moved the weapon it was a big penis." (ECF 45-1 and 46-1 at ¶¶ 29). She also stated that she had heard Pecora make comments to Robbins on multiple occasions about her appearance, which made Plaintiff uncomfortable.[1] (Id.). Haverluk later met with other potential

---

[1] Plaintiff avers that Pecora's harassing conduct towards women employees dated back to November 2019. (ECF 45-1 at ¶ 8). Plaintiff alleges that this included treating women poorly and verbally abusing them, throwing a light at someone and hitting her foot, talking about how he is a swinger and wants to leave his wife so he can sleep with multiple women, and instances of him being "touchy." (Id. at ¶ 9). Defendant disputes that it had knowledge of any of these allegations against Pecora. (ECF 46-1 at ¶¶ 8-9).

witnesses as well.  (ECF 40-2 and 45-2 at ¶¶ 22).  After speaking with Plaintiff and other witnesses, Haverluk met with Pecora, who Haverluk explains "said that he made comments, but did not believe they were of the same nature that [Plaintiff] was saying they were."  (Id. at ¶¶ 24-25).

Next, Defendant convened a panel to review the investigation.  (Id. at ¶¶ 26).  Although Haverluk recommended terminating Pecora, the panel decided to issue a written warning.  (Id. at ¶¶ 27; ECF 45-1 and 46-1 at ¶¶ 38).  Plaintiff requested that she not be required to work with Pecora moving forward, which was granted.  (ECF 40-2 and 45-2 at ¶¶ 35).  Her request to not work at the Tomlin Station urgent care location, even when Pecora was not working, was not granted, although she only worked at the Tomlin Station location on three occasions following her July 3, 2020 complaint – on December 1, 2020; March 29, 2021; and April 1, 2021.  (Id. at ¶¶ 36, 49).  Plaintiff was scheduled to work with Pecora on December 14, 2020.  (Id. at ¶¶ 45).  Plaintiff informed Haverluk of this scheduling, and Plaintiff was rescheduled so as to not work at Tomlin Station on December 14, 2020.  (Id. at ¶¶ 45, 47-48).  Pecora resigned from Inspira in December 2020.  (Id. at ¶¶ 29).  Plaintiff did not work with Pecora any time following her July 3, 2020 complaint.  (Id. at ¶¶ 38).

On December 12, 2020, Human Resources Director Stephanie Walker advised Plaintiff that she would be temporarily assigned to Inspira Medical Center – Mullica Hill, which is a hospital location rather than an urgent care. (Id. at ¶¶ 51, 55). Robbins testified that Walker made the determinations of who would be subject to this temporary transfer. (Id. at ¶¶ 53).[2] The additional need at the hospital was due to a COVID-19 surge. (Id. at ¶¶ 55-56). Plaintiff was one of eight full-time LPNs reassigned to the hospital. (Id. at ¶¶ 59). This included LPNs with greater seniority than Plaintiff. (Id. at ¶¶ 61).

In response to her hospital assignment, Plaintiff advised Walker that she "may be then going out on medical disability" due to a heart and lung condition. (Id. at ¶¶ 62). On December 17, 2020, Plaintiff submitted a leave of absence request. (Id. at ¶¶ 67). Defendant granted her leave request and granted FMLA leave, with instruction to provide medical certification of her condition. (Id. at ¶¶ 68). On December 30, 2020, Plaintiff's doctor provided the medical certification, stating that "Plaintiff would be 'incapacitated for a single continuous period of time due to [her] medical condition' from December 16, 2020 to March 10, 2021." (Id. at ¶¶ 69-70 (alteration in

---

[2] Plaintiff admits that Robbins testified that Walker made the determination, but disputes this paragraph stating that "Robbins' credibility is questionable." (ECF 45-2 at ¶ 53).

original)).  Plaintiff avers that she submitted the leave
request only because of the hospital assignment, that her doctor
was recommending leave because of the hospital assignment, and
that her other accommodation request, to remain at urgent care,
was denied.  (ECF 45-1 at ¶¶ 88-90).  Defendant disputes that
Plaintiff's doctor only recommended leave because of the
hospital setting, stating that this is "not noted on the
certification from the doctor provided."  (ECF 46-1 at ¶ 88).

Plaintiff returned from leave in March 2021.  (ECF 40-2 and
45-2 at ¶¶ 72).  On the first day that Plaintiff returned to
work, she was initially unable to log in to the computer system.
(Id. at ¶¶ 129).  This was remedied the same day.  (Id.).  Also
upon her return from leave, Plaintiff learned that her
anticipated holiday schedule had been changed.  (Id. at ¶¶ 124).

Following her return, there were two incidents involving
Plaintiff.  (Id. at ¶¶ 72).  On April 4, 2021, Plaintiff was
working at the Woolwich urgent care when a patient came in with
his daughter for an x-ray. (Id. at ¶¶ 73-74).  His daughter
advised that he had a history of pulmonary embolism.  (Id. at ¶¶
75).  Plaintiff advised that Woolwich did not have x-ray
capabilities, and so he would be sent to Tomlin Station.  (Id.
at ¶¶ 76).  The patient left without being seen by a physician.
(Id. at ¶¶ 77).  Later, the patient presented at Tomlin Station
and was "'grey, in respiratory distress' and was subsequently

admitted to the hospital with multiple pulmonary embolisms."

(Id. at ¶¶ 78).  Prior to this incident, on March 25, 2021,

Robbins sent an email to Plaintiff and others stating that:

> "**[u]nder <u>no</u> circumstance should any patient be
> turned away for service** without [Robbins] being
> notified in real time. If anyone presents to a
> facility for an emergency, or for a service you
> do not feel we can provide **we are not to tell the
> patient what's best for them or refer them to
> another facility**. The patient is still to be
> registered and placed into an exam room for the
> physician to make the decision on if the patient
> needs further care at a hospital."

(Id. at ¶¶ 79 (emphasis in original)).  Plaintiff disputes the

characterization of this as a "safety incident" and alleges that

she tried to have the patient seen by a physician, and that what

happened with this patient is a common occurrence at Inspira.

(ECF 45-2 at ¶¶ 72, 77, 79).

On April 8, 2021, Plaintiff was working at the Woolwich

urgent care.  (ECF 40-2 and 45-2 at ¶¶ 82).  On this date there

was a patient in medical distress.  (Id. at ¶¶ 85).  The

attending physician, Dr. Diane McQuillen, instructed Plaintiff

to assist with this patient.  (Id. at ¶¶ 86).  Plaintiff

refused, stating that she was "on the phone with employee

health."  (Id.).  Plaintiff asserts that she was experiencing

COVID symptoms, was instructed to report for PCR testing, and

pursuant to Defendant's COVID protocols employees were not

permitted to continue working until cleared by Employee Health.

(Id. at ¶¶ 93; ECF 45-2 at ¶ 89).  Plaintiff had received the
COVID-19 vaccine the day prior.  (ECF 40-2 and 45-2 at ¶¶ 94).
The patient was later admitted to the hospital.  (Id. at ¶¶ 87).
McQuillen sent an email to Robbins and Balogun the following
morning documenting the incident, and stating that Plaintiff
ignored her request to "get Oxygen for the patient."  (Id. at ¶¶
89).

After this second incident, Plaintiff was suspended pending
investigation into both incidents.  (Id. at ¶¶ 102).  Defendant
convened a panel.  (Id. at ¶¶ 108).  The panel decided to
terminate Plaintiff's employment.  (Id. at ¶¶ 112).  Plaintiff
then resigned on April 22, 2021 in lieu of termination, in order
to receive the benefit of her accrued paid time off.  (Id. at ¶¶
113).

On January 3, 2022, Plaintiff filed her initial Complaint,
and on August 2, 2022 she filed an Amended Complaint.  (ECF 1,
ECF 26).  In Plaintiff's Amended Complaint she asserts the
following claims: Hostile Work Environment and Retaliation in
violation of the NJLAD (Count I); Disability Discrimination,
Retaliation, and Hostile Work Environment in violation of the
NJLAD (Count II); Retaliation and Interference in violation of
the Family and Medical Leave Act ("FMLA") (Count III); Hostile
Work Environment and Retaliation in violation of Title VII
(Count IV); and Disability Discrimination, Relation, and Hostile

Work Environment in violation of the Americans with Disabilities
Act ("ADA") (Count V).

On August 16, 2022, Defendant filed its Answer.  (ECF 30).
On April 21, 2023 Defendant filed a Motion for Summary Judgment
(ECF 40).  Plaintiff filed her Response under seal on June 6,
2023.  (ECF 45).  On June 20, 2023, Defendant filed its Reply.
(ECF 46).  On June 27, 2023, Plaintiff filed a Motion to file a
Sur-Reply.  (ECF 47).  On July 5, 2023, Defendant filed a
Response to Plaintiff's Motion to File a Sur-Reply (ECF 48), and
on July 12, 2023 Plaintiff filed her Reply. (ECF 49).  On July
26, 2023, Plaintiff filed a Motion to Seal. (ECF 50).  This
Court will address each of these pending motions in this
Opinion, addressing each in turn.

## II.  **SUBJECT MATTER JURISDICTION**

This Court has subject matter jurisdiction over
Plaintiff's claims pursuant to 28 U.S.C. § 1331 and § 1367.

## III.  **LEGAL STANDARD FOR MOTION TO FILE SUR-REPLY**

Local Rule 7.1(d) controls the filing of sur-replies, and
provides that "[n]o sur-replies are permitted without permission
of the Judge to whom the case is assigned."  Loc. R. Civ. P.
7.1(d)(6).

The Court has complete discretion to permit sur-replies.
However, in making this determination Courts typically consider
whether the movant's reply includes new arguments such that it

is prudent to permit the respondent an opportunity to address
the new content, or whether other exceptional circumstances
weigh in favor of permitting further briefing.  See United
States ex rel. Silver v. Omnicare, Inc., No. 11-1326, 2020 WL
7022664, at *2 (D.N.J. Nov. 30, 2020).  As a matter of judicial
economy, the Court may elect to deny further briefing where it
would be redundant.  While the Court utilizes these guiding
principles, the Court has discretion to permit or deny
supplemental briefing even where no new information is
presented.

### IV.  DISCUSSION OF MOTION TO FILE SUR-REPLY

Plaintiff avers that, in its Reply, Defendant "made
numerous new arguments, including but not limited to submitting
a new certification of an improper witness, arguing
authentication issues pertaining to Plaintiff's evidence, in
addition to other arguments."  (ECF 47 at ¶ 4).  Defendant
responds that it did not make new arguments in its Reply, and
Plaintiff had the opportunity to present any of the points set
out in her proposed Sur-Reply in her Opposition Brief.  (ECF 48
at 4).

Plaintiff avers that the following are new arguments
raised by Defendant in its Reply: (1) that Plaintiff's
deposition testimony stating that she was retaliated against for
her complaint contradicts the position in her opposition that

continued objections to her work environment constitute a
protected activity; (2) that Plaintiff's "return date from leave
is not what is used for proximity of timing purposes" for her
ADA and FMLA retaliation claims; (3) that the seniority of staff
considered for transfer to the hospital did not include per diem
workers, workers presently on a leave of absence, or former
employees, which Defendant supported by a certification of an
individual, Stephanie Walker; (4) that the circumstances of
Plaintiff's former co-worker who turned patients away was
different than Plaintiff's; and (5) that assignment to the
hospital was part of Plaintiff's essential job function.  (ECF
47-1 at 5-10).  This Court finds that Defendant did not present
new arguments in its Reply necessitating further briefing.

First, in its Motion Brief Defendant referred to the date
of Plaintiff's complaint on July 3, 2020 as the date of her
alleged protected activity, and set out its explanation of the
timeline of the alleged retaliation as the acts relate to that
date.  (ECF 40-1 at 28).  Plaintiff averred in her Opposition
Brief that the allegedly retaliatory acts occurred shortly after
her continued objections to her hostile work environment,
including an allegation that her termination was "within just
*two weeks* of her most recent objection to the hostile work
environment."  (ECF 45 at 29 (emphasis in original)).  In its
Reply, Defendant responded by pointing to Plaintiff's deposition

testimony in support of its position that the alleged protected
activity was the complaint, not later emails and objections.
(ECF 46 at 10).  Further Defendant argues that the objection to
working at a specific location is not a protected activity.
(Id. at 11).  Defendant does not present a new argument here, it
merely responds to Plaintiff's Opposition by reiterating its
position and explaining why it disagrees with Plaintiff's
counter.  Plaintiff's position on this point is clear from her
Opposition Brief, and no further briefing is needed.

Second, in its Motion Brief Defendant argued that
Plaintiff cannot establish causation between her termination and
her FMLA leave because the termination was more than four months
after her leave request.  (ECF 40-1 at 33).  In her Opposition,
Plaintiff responded that she can establish causation because the
termination was just one month after her return from FMLA leave.
(ECF 45 at 28-29).  Defendant reiterates its position that there
is no causation because of the amount of time between her
*request* for leave and the termination.  (ECF 46 at 11).  Again,
this is not a new argument.  Plaintiff had an opportunity in her
Opposition Brief to explain her position that the relevant
timeline is actually when she returned from leave.

Third, in its Motion Brief Defendant explained that the
reason for Plaintiff's transfer to the hospital was need based
on a COVID-19 surge, and that "seven other full time LPN's were

also transferred." (ECFR 40-1 at 19, 30-31, 35). Although
Defendant's Motion brief did not set out its criteria for
selecting who would be transferred, it noted in its Statement of
Material Facts that Plaintiff was one of eight full-time LPNs
reassigned, including three with more seniority than Plaintiff.
(ECF 49-2 at ¶¶ 59-61). The Statement of Material Facts also
sets out that the reassignments were determined by Stephanie
Walker, the Human Resources Director. (Id. at ¶ 53). Plaintiff
responded in her Opposition Brief that she was selected over
less senior employees. (ECF 45 at 28). Thus, Defendant
responded by explaining the seniority and transfer criteria --
that transfer only included full-time employees, and that the
list of less senior staff that Plaintiff pointed to included
employees on a leave of absence and former employees.

Again, Defendant did not present a new argument in its
Reply, but rather responded to a detail Plaintiff focused on.
To the extent the record is unclear about the seniority of
certain staff members that were or were not transferred, this
may present a factual question, but it does not necessitate
further briefing.

As part of Plaintiff's analysis that the information about
seniority presents a new argument Plaintiff asserts that
Defendant should not be permitted to "insert *brand new evidence*
for the first time through a certification by Walker, an

13

individual <u>never previously incorporated in Defendant's Rule 26 disclosures</u>."  (ECF 49 at 5).  Plaintiff argues that the information supported by Walker's certification "could not have been addressed by Plaintiff prior to Defendant's reply brief because it did not exist either in Defendant's initial brief *or discovery*."  (Id.).  Defendant explains that the certification was submitted in direct response to Plaintiff misinterpreting an exhibit attached to her Opposition, and notes that there is a certification from Walker attached to the Motion Brief as well in which she explains that only full-time staff were subject to the transfer and thus this is not new information presented in the Reply.  (ECF 49 at 11).

The question of whether the Court may consider information presented in a certification rather than information within the record is distinct from the question of whether there is new information in the Reply necessitating a Sur-Reply.  The information here is not new as it is either in the certification to the Motion Brief or is represented within the exhibit Plaintiff relies on in her Opposition.  To the extent that there is a dispute as to what the record shows, this may weigh against summary judgment if such information is material.  This Court will address this issue if necessary within its summary judgment analysis below.

Fourth, in Plaintiff's Opposition she argued that Defendant's statement that Plaintiff was fired in part because of an incident where she turned away a patient without being seen by a doctor is pretext because another employee received a lesser disciplinary action for this same conduct.  (ECF 45 at 29-30).  Defendant responded in its Reply that Plaintiff and this other employee were not similarly situated, stating that their conduct was different and that unlike Plaintiff who was an LPN the other employee was a licensed technician.  (ECF 46 at 14).  This is not a new argument; rather, it is a direct reply to a statement Plaintiff made in her Opposition.  Again, to the extent there is a dispute here, it may present a factual question, but does not require further briefing.

Fifth, Defendant explicitly stated in a footnote in its Motion Brief that "[t]o the extent Plaintiff is contending she was unable to work in the hospital or other locations, she was then unable to perform the essential functions of her job, which included the ability to work at other locations based on staffing needs."  (ECF 40-1 at 34 fn.7).  It is plainly not a new argument raised in Defendant's Reply.

This Court concludes that Defendant did not raise new arguments in its Reply so as to warrant a Sur-Reply.  This Court will therefore deny Plaintiff's Motion for a Sur-Reply, and will

proceed to analyze the Motion for Summary Judgment. This Court will not consider the arguments presented in the Sur-Reply.

**V.    LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that given the undisputed facts the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Fed. R. Civ. P. 56(a).

A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a disputed fact may affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence. Id. at 255. Instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Id.

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex, 477
U.S. at 323.  Once the moving party has met this burden, the
burden shifts and the nonmoving party must identify specific
facts showing that there is a genuine issue for trial.  Id.  To
withstand a properly supported motion for summary judgment, the
nonmoving party must identify specific facts and affirmative
evidence that contradict those offered by the moving party.
Anderson, 477 U.S. at 256-57.  A party opposing summary judgment
must do more than just rest upon mere allegations, general
denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d
228, 232 (3d Cir. 2001).

## VI.   DISCUSSION OF MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on each of Plaintiff's
claims.  First, we address her hostile work environment claims,
starting with her sex-based claim and then proceeding to her
disability-based claim.  Next, we discuss her failure to
accommodate claim under the ADA.  Then, we assess her FMLA
interference claim.  Finally, we address her multiple
retaliation claims, premised on (1) Title VII and the NJLAD, (2)
the ADA and the NJLAD, and (3) the FMLA.

### A. Sex-Based Hostile Work Environment

For her claim of a sex-based hostile work environment under
the NJLAD and Title VII, Plaintiff must show that: (1) she

17

suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability.  Mandel v. M& Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)).  The first four elements establish a hostile work environment, and the fifth element establishes employer liability.  Hudson v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

Defendant argues that Plaintiff has not demonstrated severe or pervasive conduct, nor has she established respondeat superior liability.

### i. Severe or Pervasive

To determine if a work environment is hostile or abusive, courts look at the totality of the circumstances, which includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Mandel, 706 F.3d at 168.  The essential character of a hostile work environment is a work place that is "permeated with *discriminatory* intimidation, ridicule, and insult, that is sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive work environment.'"  <u>McKinnon v. Gonzales</u>, 642 F.Supp.2d 410, 421 (D.N.J. 2009) (<u>quoting</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002)) (emphasis in original); <u>see also</u> <u>Fitzgerald v. Shore Memorial Hosp.</u>, 92 F.Supp.3d 214, 240 (D.N.J. 2015).

"The correct standard is 'severe *or* pervasive.'" <u>Castleberry v. STI Grp.</u>, 863 F.3d 259, 264 (3d Cir. 2017) (emphasis in original).  As such, "'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."  <u>Id.</u>  This analysis "requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Id.</u> (<u>quoting</u> <u>Harris</u>, 510 U.S. 17, 23 (1993)).

"[B]oth the Supreme Court and the Third Circuit have been clear that 'offhand comments, and isolated incidents (unless extremely serious)' are not sufficient" to establish a hostile work environment.  <u>Nuness v. Simon & Schuster, Inc.</u>, 221 F.Supp.3d 596, 601 (D.N.J. 2016) (<u>quoting</u> <u>Faragher v. City of</u>

Boca Raton, 524 U.S. 775, 778 (1998)).  Neither Title VII nor
the NJLAD are intended to be a "general civility code" for
workplace conduct.  Id.

Defendant argues that "[s]ummary judgment on Plaintiff's
NJLAD and Title VII hostile work environment claims is proper
because Plaintiff has failed to show the conduct at issue –
isolated to the boorish behavior of a single physician on a
single day nine months before her termination – was objectively
pervasive or severe so as to alter the conditions of her
employment."  (ECF 40-1 at 10).  Defendant contends that "the
incidents of which Plaintiff complains were not frequent and
instead all occurred on only one day" and thus the conduct is
not pervasive.  (ECF 40-1 at 15).  Defendant also avers that the
conduct alleged was "not severe and instead amount[s] to boorish
behavior falling well short of the type of behavior required for
a hostile work environment."  (ECF 40-1 at 16).

Plaintiff points to the numerous incidents that occurred
throughout that day, including Pecora (1) commenting to
Plaintiff that "he missed looking at [her] 'ass'"; (2)
commenting while examining her knee that "this would feel better
with no clothes on"; (3) running his fingers through Plaintiff's
hair and commenting that he likes her hair "like this"; (4)
making additional inappropriate comments about Plaintiff's
"'ass' and how good it looked" throughout the day, including

20

stating "your ass looks good bent over the desk."  (ECF 45 at 18).  She also avers that Pecora's history with "every other female working at the Tomlin location . . . is highly probative of the nature of the working environment."  (Id. at 16).

This Court does not take these allegations lightly, and does not condone the conduct of Pecora.  However, the bar in Title VII cases is high, in order "to ensure that Title VII does not become a 'general civility code.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Here, even when viewing the facts in the light most favorable to Plaintiff as offensive as they are, the allegations do not rise to the level of severe or pervasive as a matter of law.

First, this Court's looks to the severity of the conduct. As Plaintiff points out, Courts have found that a single act of touching can be severe enough to satisfy the severe and pervasive prong.  However, the circumstances of the touching and the totality of the allegations inform whether the severe or pervasive prong is met.  For example, a single instance of sexual assault has been found sufficiently severe to establish this prong of the hostile work environment analysis.  See Vandegrift v. City of Philadelphia, 228 F. Supp. 3d 464, 485 (E.D. Pa. 2017) ("Sexual assault is the most severe form of harassment, and severe harassment is actionable under a hostile work environment claim.").  Similarly, a judge of this Court has

21

found that this prong was established where a plaintiff was forced into a small room, not permitted to leave, and grabbed on her breast. McClement v. Port Auth. Trans-Hudson Corp., No. 11-06839, 2022 WL 111047, at *7 (D.N.J. Jan. 12, 2022) (finding that a reasonable juror could find the conduct sufficiently severe to create a hostile work environment where there was "a purported sexual touching [of plaintiff's breast] and an implied physical threat, blocking Plaintiff's ability to leave the room, and preventing her from calling for help").

On the other hand, courts have found physical acts that involved touching a plaintiff's breasts, touching a plaintiff's buttocks, and kissing a plaintiff insufficient to establish the severe or pervasive prong. See, e.g., Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-440 (E.D. Pa. 2001) (finding defendant, over an 18-month period, touching plaintiff's breast, propositioning her for sex, offering her money to go out with him, removing a bottle of wine from his pants, asking her to join him later at a local hotel for a "good time," and again touching her breasts and buttocks insufficient); Bonora v. UGI Utilities, Inc., No. 99-5539, 2000 WL 1539077, at *4 (E.D. Pa. Oct. 18, 2000) (finding defendant touching plaintiff's hand, brushing his buttocks against hers, and touching her waist insufficient); McGraw v. Wyeth-Ayerst Lab., Inc., No. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (finding

defendant kissing plaintiff, touching her face, asking her out on dates, inquiring about her marriage insufficient).  The touching of her hair Plaintiff has alleged is less severe than these instances that courts have also found insufficient.

Looking at her allegations together, Plaintiff has not established severe conduct as the majority of her allegations set out comments that Pecora made to Plaintiff about her appearance, one sexually suggestive comment that he would prefer to examine her without clothes, and one instance of touching that was limited to touching her hair.  (See ECF 40-2 and 45-2 at ¶¶ 16); See Carroll v. Acme Truck Line, Inc., 992 F. Supp. 2d 512, 526 (W.D. Pa. 2014) (finding Plaintiff had not established severe or pervasive conduct where Plaintiff alleged a co-worker asked Plaintiff to sit on his lap and hugged her, called her "buttercup," asked Plaintiff to go on a weekend trip and out to dinner with him, and on one occasion Plaintiff walked in on him while he was sleeping "completely exposed" and he "'looked her up and down' and made comments about her clothing . . . which [he] admitted in his deposition may have been made in a sexual manner.").  Again, although highly inappropriate and offensive, [t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability." Brown-Baumbach v. B&B Auto, Inc., 437 F. App'x 129, 133 (3d Cir.

2011) (holding that "not every sexual comment, action, or joke creates a hostile work environment").

Next, the incidents alleged are not pervasive, where there are only a handful of allegations and they occurred primarily on one single day.  See Henderson v. United Parcel Serv., No. 17-13059, 2020 WL 1983481, at *8 (D.N.J. Apr. 27, 2020) (finding "five incidents over the course of at least 26 months" not pervasive); Bacone v. Phila. Hous. Auth., 112 F. App'x 127, 129 (3d Cir. 2004) ("The behavior at issue involved no more than four incidents during the span of two weeks, and though they were offensive, they are not pervasive enough to rise to the level of a Title VII violation."); Tavares v. Builders FirstSource Ne. Grp., Inc., No. 21-02964, 2023 WL 4248770, at *6 (D.N.J. June 29, 2023) ("Within the parameters set forth by New Jersey courts, the allegations of sexually harassing conduct in this case were not frequent, since Plaintiff alleges only three incidents occurring over the course of at [sic] six months.").

It is undisputed that Plaintiff had worked at Inspira for approximately nine (9) months at the time of the alleged harassment.  (See ECF 40-2 and 45-2 at ¶¶ 1, 9).  Over that period, Plaintiff has only pointed to one other occasion where Pecora made any other sexual reference – pointing to an instance where he showed a picture of himself in a Halloween costume, dressed as a reaper "but when you moved the weapon, it was a big

penis." (ECF 45-1 and 46-1 at ¶¶ 29). She also noted that she had heard Pecora make comments about her supervisor Robbins' appearance. (Id.). Each of these isolated incidents, (See ECF 40-2 and 45-2 at ¶¶ 16), even when viewed together, fail to establish pervasive conduct.

There is no doubt that Pecora's conduct was inappropriate; however, without a continued pattern of this activity it is not pervasive enough so as to create a hostile environment. If Percora's conduct had continued the outcome here might well be different. See Galarza v. Best W. Plus - Genetti Hotel & Conf. Ctr., No. 19-0400, 2020 WL 6107046, at *5 (M.D. Pa. Oct. 15, 2020) (finding the conduct severe or pervasive where "Plaintiff claims that she was subjected to a barrage of lewd comments and gestures on a daily basis for the five months that she worked for the Defendant."). That said, this Court notes that Defendant investigated Plaintiff's complaint and Plaintiff did not work with Pecora after her complaint. (See ECF 40-2 and 45-2 at ¶¶ 38). To fulfill the severe or pervasive prong, "the conduct must rise to a level of 'alter[ing] the conditions of the victim's employment and creat[ing] an abusive working environment.'" Logan v. Millstone Manor LLC, No. 20-14433, 2022 WL 1720172, at *5 (D.N.J. May 27, 2022) (quoting v. Toys R Us, Inc., 626 A.2d 445, 455-56 (N.J. 1993)). Under the facts here, with the conduct mostly limited to one day, and with Plaintiff

25

not working with Pecora again after his conduct was reported to management, Plaintiff has not pointed to severe or pervasive conduct that altered her conditions of employment.

Plaintiff further cites to a history of conduct from Pecora; however, Plaintiff does not claim that she was present for these other alleged incidents.  (ECF 45-1 at ¶¶ 8-9).  While conduct directed to a third party may support allegations of a severe or pervasive hostile environment, the additional conduct Plaintiff points to here does not support her claim where she does not state that she witnessed nor had firsthand knowledge of the conduct.  See Godfrey v. Princeton Theological Seminary, 952 A.2d 1034, 1048 (N.J. 2008) ("To satisfy the severe-or-pervasive element of a hostile work environment claim, a plaintiff must marshal evidence of bad conduct of which she has firsthand knowledge."); Ventura v. Montclair State Univ., No. CIV.A. 08-5792 SRC, 2011 WL 6339656, at *10 (D.N.J. Dec. 19, 2011) ("A hostile work environment claim cannot be based upon statements that are made outside the presence of the plaintiff.").

Although this Court's determination that the conduct alleged does not meet the severe or pervasive requirement is enough to require dismissal of this claim, the Court will also address the question of vicarious liability.

**ii. Vicarious Liability**

Generally, an employer is vicariously liable for the conduct of a supervisor where the supervisor acted within the scope of his or her employment.  Wilson v. New Jersey, No. 16-7915, 2019 WL 5485395, at *11 (D.N.J. Oct. 25, 2019).  However, it is undisputed here that Pecora was not Plaintiff's supervisor.  (ECF 40-2 and 45-2 at ¶¶ 10-12).

"[A]n employer is liable for a co-worker's harassing conduct only if 'management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment.'"  Nuness, 221 F.Supp.3d at 603-04 (quoting Herman v. Coastal Corp., 791 A.2d 238, 252 (N.J. Super. Ct. App. Div. 2002)).  In addition, "the plaintiff must show that the employer failed to provide a reasonable avenue for complaint or was aware of the alleged harassment and failed to take appropriate remedial action."  Id.

Defendant explains that it has an effective harassment policy and anti-harassment training.  (ECF 40-1 at 20).  Defendant also advises that Plaintiff was able to file a complaint about the harassment, resulting in an investigation which effectively barred Pecora from ever working with Plaintiff again.  (Id. at 21).

Plaintiff responds that "Defendant was **_well aware_** of the inappropriate conduct by Pecora **_for nearly a year before Ms. Williams' complaints of harassment_**, failing entirely to take

adequate action to remedy the situation, but also that they failed to take appropriate action *following* Ms. Williams' complaints, continuing to require her to work in fear at the same location as Pecora who was never appropriately reprimanded." (ECF 45 at 9) (emphasis in original). Plaintiff expands that despite a recommendation of termination from one human resources professional, a "*significantly less severe action*" was taken. (Id. at 12) (emphasis in original). Specifically, "Defendant simply issued Pecora **_a letter_**, *not* on Defendant's formal disciplinary action forms" providing him with a warning. (Id. at 13). Plaintiff argues that this is an "unreasonable response." (Id.). Plaintiff further asserts that she was pressured to retract her complaints and change her story. (Id.).

Plaintiff also argues that Defendant's failure to move her to "one of the many other locations" despite her fear of running into Pecora was an improper response that caused her "extreme anxiety and physical illness." (Id. at 14). Plaintiff advises that she was required to work at the Tomlin location on December 1, 2020. (Id. at 21). She was scheduled to work at the Tomlin Station location again on December 14, 2020, when Pecora would also be working. (Id.). Plaintiff complained about this assignment, and was not actually required to work at the Tomlin Station location on that day. (Id.). She was required to work

at the Tomlin location again after her leave on March 29, 2021
and April 1, 2021.  (Id. at 22).

Defendant counters that Plaintiff was staffed to work at
the Tomlin location "on only three occasions following her July
3, 2020 complaint, which Plaintiff does not dispute was because
of staffing needs."  (ECF 46 at 9) (citation omitted).  In
addition, Defendant notes that Plaintiff's disagreement with the
remedial action taken against Pecora does not render it
inappropriate or unreasonable.  (Id.).  Defendant further
advises that Plaintiff "was not subject to any harassment by
Pecora after Inspira took action."  (Id. at 9-10).  In addition,
while Defendant concedes that there had been prior complaints
against Pecora "the vast majority of prior complaints Plaintiff
relies upon were of *a non-sexual nature* with only one employee
mentioning anything sexually related."  (Id.) (emphasis in
original).  Moreover, Defendant "investigated the complaints and
counseled Pecora."  (Id.).

Even if the conduct Plaintiff alleges were sufficient to
establish the severe or pervasive standard, she has not
demonstrated that Defendant is vicariously liable.  It is
undisputed that Defendant took immediate action in response to
her complaint.  (ECF 40-2 and 45-2 at ¶¶ 19-20).  Human
Resources Director Haverluck interviewed Plaintiff, interviewed
witnesses, and interviewed Pecora.  (Id. at ¶¶ 21-24).  Then a

panel of Inspira staff convened to discuss the conduct and repercussions, deciding to provide Pecora with a written warning.  (Id. at ¶¶ 26-27).  Further, Defendant heeded Plaintiff's request to no longer work with Pecora, and Plaintiff never worked with Pecora again.  (Id. at ¶¶ 35).

While her request to not work at the Tomlin Station location even when Pecora was not working was denied, this does not render Defendant's response unreasonable.  In addition, this Court notes that Plaintiff only worked at Tomlin Station three times after her complaint against Pecora, two of which were after he was no longer employed at Inspira.  (Id. at ¶¶ 36, 38, 49).  On one instance where Plaintiff was scheduled with Pecora and brought this to her supervisor's attention, the schedule was remedied and she was not required to work with Pecora.  (Id. at ¶¶ 48).

While Plaintiff is dissatisfied with the repercussions imposed on Pecora, asserting that the consequences should have been more severe, Defendant's response is sufficient to demonstrate that they had a harassment policy that is more than mere words.  Defendant's response ended the harassment, as Plaintiff never worked with Pecora again.  See Nuness, 221 F. Supp. at 604 ("The employer cannot be held liable when it responds in a manner which stops the harassment.").

Plaintiff makes one allegation that gives this Court pause in determining whether there may be vicarious liability, stating that she was pressured to retract her complaint.  (ECF 45 at 13).  In support of this allegation, Plaintiff points to an email that she sent to Haverluk expressing frustration with having to tell her story over and over.  (ECF 45-1 at 42; ECF 45-22 at 2).  That said, the email does not include any suggestion that she was being pressured to retract her complaint, nor does her Statement of Facts allege such pressure.  (Id.).  This allegation appears only in argument within the briefing.  Thus, Plaintiff has not pointed to the record in support of this allegation.  As such, this Court does not view this as a disputed fact requiring denial of summary judgment on this claim.

As Plaintiff had not carried her burden in demonstrating severe or pervasive conduct nor demonstrating vicarious liability should apply, her claim for sex-based hostile work environment under Title VII and the NJLAD will be dismissed.

## B. Disability-Based Hostile Work Environment

Plaintiff asserts disability-based hostile work environment claims arising from the ADA and NJLAD.  With respect to the ADA claim, the Third Circuit has held that a disability-based harassment claim requires Plaintiff demonstrate that:

> (1) [plaintiff] is a qualified individual
> with a disability under the ADA; (2) she was
> subject to unwelcome harassment; (3) the
> harassment was based on her disability or a
> request for an accommodation; (4) the
> harassment was sufficiently severe or
> pervasive to alter the conditions of her
> employment and to create an abusive working
> environment; and (5) that [defendant] knew
> or should have known of the harassment and
> failed to take prompt effective remedial
> action.

Vanhook v. Cooper Health Sys., No. 19-14864, 2021 WL 2186989, at *8 (D.N.J. May 28, 2021), aff'd, No. 21-2213, 2022 WL 990220 (3d Cir. Mar. 31, 2022) (quoting Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999)) (alteration in original).

Similarly, a hostile work environment claim under the NJLAD requires a plaintiff to prove the "complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*." Lehmann v. Toys R Us, Inc., 626 A.2d 445, 454 (N.J. 1993) (emphasis in original). In addressing hostile work environment claims under the NJLAD, "courts must consider the cumulative effect of the various incidents." Id. at 455.

Defendant asserts none of the allegations Plaintiff has raised related to her claim of disability-based hostile work

environment were based on her alleged disability, and moreover they were not severe or pervasive.  (ECF 40-1 at 22-23).

Defendant summarizes that "the acts which form the basis of her disability-based hostile work environment claim were: (1) Inspira switching her holiday schedule when she returned from her FMLA leave of absence on March 13, 2021; (2) not having her user name and password credentials prepared when she returned from her leave; and (3) Dr. McQuillen "stomping off" when Plaintiff told her "'I wouldn't get off the phone,' when McQuillen asked that she do so to help her with a patient in respiratory distress."  (Id. at 23).

Defendant explains that the holiday schedule was changed because it is "part of Inspira's practice to rotate schedules each calendar year."  (Id.).  Next, "[t]he user name and password matter was a temporary issue that was corrected on the same day Plaintiff returned to work."  (Id.).  Finally, McQuillen "stomp[ed] off" "when Plaintiff refused her directive to hang up the phone to help her with a patient who needed oxygen."  (Id.).  In further support, Defendant notes that Plaintiff testified that she is "not aware of any comments ever being made related to her disability."  (Id. at 24).

Arguing that this conduct does not rise to the level of severe or pervasive even if it were based on Plaintiff's alleged

disability, Defendant argues that these "are all minor and isolated incidents."  (Id.).

Plaintiff adds to these allegations stating that she was further "treated in a negative manner after her return" from FMLA leave.  (ECF 45 at 24).  She states that management did not acknowledge her and required a scheduled meeting in order to speak with her.  (Id.).  She alleges that the feeling was palpable and she felt spoken down to.  (Id.).

Plaintiff has pointed to three isolated incidents with minimal, if any, effect on the work environment.  First, the change in holiday schedule does not have any bearing on the work environment.  Second, Plaintiff's inability to log into the computer also did not create a hostile work environment.  It was also remedied within the same day.  (ECF 40-2 and 45-2 at ¶¶ 129).  The third allegation is the only one that has any element that could possibly demonstrate a hostile work environment; however, a single incident of a doctor "stomping" away falls well below the severe or pervasive standard.  These allegations alone, and in combination, do not rise to a level of severity to establish a claim.  See Wright v. Providence Care Ctr., LLC, 822 F. App'x 85, 97 (3d Cir. 2020) (finding none of the cited incidents as "extremely serious" where Plaintiff pointed to "[o]ccurrences such as being ignored, told once to 'shut up,' hearing an offhand comment about collecting disability, being

temporarily pulled to work on another floor at the facility,
receiving a marginally negative performance review without
cause, and scheduling annoyances"); Woods v. AstraZeneca
Pharms., L.P., No. 19-00230, 2023 WL 2393649, at *24 (M.D. Pa.
Mar. 7, 2023) (finding the allegations were not severe and
pervasive where Plaintiff's supervisor stated to her on multiple
occasions that she would not last at the job due to her medical
conditions, told Plaintiff they hired additional employees in
case she got sick again, questioned her productivity due to her
medical absences, and exhibited verbal disdain about her use of
FMLA).

Moreover, Plaintiff's additional allegations of generally
feeling she was treated "negatively" and "spoken down to" are
insufficient to support her hostile work environment claim where
Plaintiff does not point to a single example.  Her allegations
here are also not sufficiently pervasive, as Plaintiff has
pointed to only three isolated incidents.  See Wright v.
Providence Care Ctr., LLC, 822 F. App'x 85, 97 (3d Cir. 2020)
(finding a "handful of incidents" over a series of months not
pervasive).

While this Court questions whether any of these alleged
acts have any relation to Plaintiff's alleged disability, we
need not make this determination, as these facts do not rise to
the level of severe or pervasive conduct.  As Plaintiff has not

demonstrated severe or pervasive disability-based harassment, this claim will be dismissed.

### C. **Failure to Accommodate**

Plaintiff alleges that Defendant failed to accommodate her disability in violation of the ADA and NJLAD.  Under the ADA, an employer discriminates against a qualified individual with a disability when the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]."  Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original).  Similarly, "[u]nder the NJLAD, an employer must 'make a reasonable accommodation to the limitations of an employee . . . who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship.'"  Gavin v. Haworth, Inc., 2016 WL 7325474 at *8 (D.N.J. 2016) (citing N.J. Admin. Code. Tit. 13, § 13–2.5; Fitzgerald v. Shore Memorial Hosp., 92 F.Supp.3d 214, 237 (D.N.J. 2015)).

To state an ADA claim for a failure to accommodate, a plaintiff must show: "(1) she is disabled, (2) she is qualified, and (3) her employer (i) refused to provide her with a proposed reasonable accommodation, or (ii) failed to engage in an

interactive process after she requested an accommodation, though a reasonable accommodation was possible." Solomon v. Sch. Dist. of Phila., 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012).  In response, "[t]he employer must then show that the proposed accommodation was not reasonable or would have caused it undue hardship, or that the employer proposed a reasonable accommodation that the plaintiff rejected." Id.  Similarly, to state a claim under the NJLAD for failure to accommodate, a plaintiff "must show that he or she (1) had a disability; (2) was otherwise qualified to participate in the activity or program at issue; and (3) was denied the benefits of the program or otherwise discriminated against because of his or her disability." Wojtkowiak v. New Jersey Motor Vehicle Com'n, 106 A.3d 519, 527 (N.J. Super. App. Div. 2015).  Under the NJLAD, "[t]he claimant must also show 'whether the accommodation was reasonable.'" Id.

Defendant explains that when Plaintiff provided information from her doctor to demonstrate that she could not work at the hospital, the doctor's certification stated that "Plaintiff *could not work at all for a three month period*." (ECF 40-1 at 37-38) (emphasis in original).  Therefore, Plaintiff's claim that an accommodation permitting her to work in a non-hospital location would have permitted her to work is not supported by the doctor's certification and Defendant could

not disregard the doctor's certification.  (Id. at 38).  In
addition, Defendant avers that it did provide Plaintiff with a
reasonable accommodation by way of a leave of absence.  (Id.).

Plaintiff states that when she was advised that she would
be transferred to the hospital, she immediately responded that
because of her heath conditions she would be unable to work in a
hospital environment.  (ECF 45 at 34).  She claims that she was
initially told that if her health conditions meant she needed to
stay in an urgent care placement that this accommodation would
be made.  (Id.).  Plaintiff asserts this would have been a
sufficient accommodation.  (Id.).  Plaintiff avers that this
accommodation was never made and she was not provided with an
explanation as to why.  (Id. at 35).  Because the accommodation
was not made, she had to take FMLA leave.  (Id.).

Defendant responds that Plaintiff's doctor's certification
made clear that she could not work in any capacity.  (ECF 46 at
19).  Defendant advises that it did engage in the interactive
process, providing Plaintiff with forms for her medical
documentation and granting her leave of absence request."  (Id.
at 20).  Defendant advises that "[t]here were no other
accommodations to discuss because Plaintiff's doctor stated she
was 'incapacitated' for several months."  (Id.).

The timeline of Plaintiff's conversation seeking an
accommodation to work in certain facilities, her leave of

absence request, and her doctor's certification is murky and there are disputed facts related to this process; however, the disputed facts are immaterial.  The disputed facts are immaterial because it is undisputed that Defendant did provide Plaintiff with a reasonable accommodation.

Although "'an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA,' . . . failure to engage in the interactive process, in itself, does not constitute such a violation." Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 194 (3d Cir. 2009) (quoting Deane v. Pocono Med. Ctr., 142 F.3d 138, 149 (3d Cir. 1998) (en banc)).  In addition, the NJLAD explicitly lists "leaves of absence" as an example of a "reasonable accommodation."  N.J. Admin. Code 13:13-2.5(b)(1)(ii).  A leave of absence is also a potential reasonable accommodation under the ADA. See Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. Pt. 1630, App. ("other accommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . .").

While "an employer has a duty to offer a reasonable accommodation to a qualified employee, 'an employee cannot make

[the] employer provide a specific accommodation if another reasonable accommodation is instead provided.'" Solomon v. Sch. Dist. of Philadelphia, 532 F. App'x 154, 158 (3d Cir. 2013) (non-precedential) (quoting Hankins v. The Gap, Inc., 84 F.3d 797, 800-01 (6th Cir. 1996)).  Therefore, although Plaintiff was not provided with the accommodation that she states she preferred, she was provided with an accommodation for her stated disability.  Thus, Plaintiff cannot demonstrate her failure to accommodate claim.  This count will be dismissed.

### D. **FMLA Interference**

Defendant argues that Plaintiff's "claims for FMLA interference fail because Plaintiff received FMLA leave and was reinstated to her prior position" following her leave.  (ECF 40-1 at 10, 39).  In a footnote in her Response, Plaintiff states, "[a]fter much thought, Ms. Williams withdraws her FMLA interference claim."  (ECF 45 at 6 fn.1).  This claim will therefore be dismissed.

### E. **Retaliation**

Plaintiff alleges retaliation claims under Title VII and the NJLAD based on her complaints about Pecora, under the ADA and NJLAD for retaliation based on her alleged disability, and under the FMLA for retaliation based on her use of her FMLA leave.  First, this Court will set out the applicable legal framework for each of these claims.  Then, because these claims

require this Court to consider many of the same arguments, this
Court will begin by addressing certain of the overlapping
factors, and then will discuss each count as needed.
Specifically, this Court will first discuss Plaintiff's alleged
adverse employment actions, and then Defendant's proffered
reasons for those actions.  Finally, the Court will look to each
claim to determine whether Plaintiff has established causation
or carried her burden to establish that Defendant's non-
discriminatory explanation is pretextual.

### i. Elements of Retaliation Claims

As described more specifically in each subsection, the
Retaliation claims are all governed by the McDonnell Douglas
burden-shifting framework.  This framework has three basic
steps.  First, the plaintiff must put forward a prima facie case
of discrimination by a preponderance of the evidence.  Sarullo
v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).  If a
plaintiff makes a prima facie case of discrimination, the
analysis continues to the second step.  At this step, the burden
shifts to the defendant to provide "a legitimate,
nondiscriminatory reason for its actions."  Tucker v. Thomas
Jefferson Univ., 484 F.App'x 710, 712 (3d Cir. 2012).  If the
defendant succeeds, the analysis proceeds to the third step.  At
this stage, "the inference of discrimination drops and the
burden shifts back to the plaintiff to show that the defendant's

41

proffered reason is merely a pretext for intentional discrimination." Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  If each side meets its burden at each stage, then summary judgment is inappropriate. Whiskin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007).  Each step of this framework is its own separate analysis. Hicks v. New Jersey Department of Corrections, et al., No. 16-00927, 2019 WL 5587324, at * 4 (D.N.J. Oct. 30, 2019).

### 1. Title VII and NJLAD Sex Based Retaliation

Plaintiff alleges retaliation for reporting Pecora's conduct pursuant to Title VII and the NJLAD.  "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).  Similarly, to make out a retaliation claim under the NJLAD, "an employee must demonstrate: '(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected

activity and the employer's adverse action.'"  <u>Martone v. Jet Aviation Flight Servs. Inc.</u>, 2020 WL 3969919, at *6 (D.N.J. July 13, 2020) (<u>quoting</u> <u>Abramson v. William Patterson College of N.J.</u>, 260 F.3d 265, 286 (3d Cir. 2001)).

If Plaintiff establishes a *prima facie* case, "the burden of production shifts to the employer to present a legitimate, non-retaliatory reason for its actions." <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015).  If such a reason is offered, the burden shifts back to the plaintiff to demonstrate that the reason was merely pretext and that retaliation was the real reason for the adverse employment action.  <u>Id.</u>; <u>see also</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'")).  "Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." <u>Daniels</u>, 776 F.3d at 193.

Defendant argues that "[Plaintiff's] claims for retaliation fail because she cannot show she was subject to an adverse employment action, cannot show a causal relationship between her

protected activity and any action, and cannot establish
pretext."  (ECF 40-1 at 10).

### 2. ADA and NJLAD Disability Based Retaliation

Plaintiff asserts disability-based retaliation claims under
the ADA and NJLAD.  To establish an ADA retaliation claim, a
plaintiff must only show there was: "(1) protected employee
activity; (2) adverse action by the employer either after or
contemporaneous with the employee's protected activity; and (3)
a causal connection between the employee's protected activity
and the employer's adverse action."  Fogleman v. Mercy Hosp.,
Inc., 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting Krouse v.
American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).  A
plaintiff need not establish they have a disability to bring a
retaliation claim under the ADA.  Krouse, 126 F.3d at 498 ("We
hold that a person's status as a 'qualified individual with a
disability' is not relevant in assessing the person's claim for
retaliation under the ADA.").

Similarly, the NJLAD makes it unlawful "[f]or any person to
take reprisals against any person because that person has
opposed any practices or acts forbidden under this act or
because that person has filed a complaint, testified or assisted
in any proceeding under this act."  N.J. Stat. Ann. § 10:5-
12(d).  Retaliation claims under the NJLAD are analyzed under
the burden-shifting framework discussed above.  Daniels, 776

F.3d at 193.  A plaintiff must first establish a prima facie
case before the burden shifts to the defendant to offer a
legitimate, non-retaliatory reason for the employment action.
Id.  The burden then shifts back to the plaintiff to demonstrate
that the asserted non-retaliatory reason was merely pretextual.
Id.

### 3. FMLA Retaliation

"The FMLA prohibits employers from discriminating against
employees who have taken FMLA leave, and also prohibits
employers from using an employee's utilization of FMLA leave as
a negative factor in employment actions, such as hiring,
promotion, or disciplinary actions." Caruso v. Bally's Atlantic
City, 2019 WL 4727912, at *5 (citing 29 U.S.C. § 2615(a)(2); 29
C.F.R. § 825.220(c)).  "To establish a retaliation claim under
the FMLA, a plaintiff must first establish a prima facie case of
retaliation by demonstrating that: (1) she availed herself of a
protected right under the FMLA; (2) she suffered an adverse
employment action; and (3) the adverse action was causally
related to the plaintiff's FMLA leave."  Id. (citing Conoshenti
v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir.
2004)).

Once a plaintiff has established a *prima facie* case, the
burden shifts to the defendant to articulate a legitimate,
nonretaliatory reason for the adverse action.  Id. (citing

Moore, 461 F.3d at 342; Krouse, 126 F.3d at 500–01).  If the defendant is successful in articulating a legitimate, nonretaliatory reason for the adverse action, the burden then shifts back to the plaintiff, who must show that the employer's proffered reason is pretextual and that the employer's actual reason for the adverse action was to retaliate against the employee for taking FMLA leave.  Id. (citing Hodgens, 144 F.3d at 161; Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 532 (D.N.J. 2008)).

### ii. Adverse Employment Actions

Defendant argues that certain of Plaintiff's alleged retaliatory acts do not constitute an adverse employment action: Plaintiff's transfer to the hospital, change in holiday schedule, and inability to log into a computer on the first day after she returned from leave.  (ECF 40-1 at 27).

Plaintiff argues that transfer to the hospital is an adverse action.  (ECF 45 at 27).  She explains that a hospital environment during a COIVD surge is a less desirable position than her urgent care placements.  (Id.).  She avers that Defendant was aware that this was a less desirable assignment, as it was presented to her as "bad news."  (Id.).  Plaintiff does not appear to argue that her change in holiday schedule or log in issues were adverse employment actions, instead discussing them in the context of her disability hostile work

environment claim.  That said, this Court will address whether those allegations rise to the level of an adverse employment action in an abundance of caution.

The standard for what constitutes an adverse employment action is different for retaliation and discrimination claims. Indeed, "[t]he standard a plaintiff must meet in establishing a materially adverse action is widely recognized to be 'lower for a retaliation claim than for a disparate treatment claim.'" McKinnon v. Gonzales, 642 F. Supp. 2d 410, 426 (D.N.J. 2009) (quoting Flynn v. N.Y. State Div. of Parole, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009)).  To satisfy the adverse employment action prong of the Title VII retaliation claim, Plaintiff "must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Moore, 461 F.3d at 342 (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  As the Supreme Court put it, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington Northern, 548 U.S. at 67.

Transfer to a less desirable rotation could constitute an adverse employment action.  See Burlington Northern, 548 U.S. at 71 (finding that the "reassignment of job duties is not

automatically actionable," but transfer from a position that was "objectively considered a better job" to a position that was "by all accounts more arduous and dirtier" can be an adverse employment action); Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152–53 (3d Cir.1999) (citation and quotations omitted) ("The Supreme Court has defined a tangible employment action as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

That said, it is undisputed that Plaintiff never actually worked in the hospital setting as she instead took a leave of absence.  Thus, even if Plaintiff could establish that the transfer was related to her sexual harassment complaint or her disability, she cannot establish injury or harm from the alleged retaliation.  See Hudson v. Cheyney Univ. of Pa., No. 14-2552, 2018 WL 6603870, at *7 (E.D. Pa. Dec. 14, 2018) ("[T]he threat of termination . . . does not amount to an adverse employment action because no punitive action was taken against plaintiff"); Leblanc v. Hill Sch., No. 14-1674, 2015 WL 144135, at *16 (E.D. Pa. Jan. 12, 2015) ("[W]hen an employer threatens to take an action but does not in fact take that action, the threat does not constitute a materially adverse employment action for the purposes of retaliation claims."); Ilori v. Carnegie Mellon

Univ., 742 F. Supp. 2d 734, 760 (W.D. Pa. 2010) (holding that a
"threat [that] was never carried out and had no demonstrable
impact on plaintiff's employment" is insufficient to constitute
an adverse employment action); see also Young v. St. James
Mgmt., LLC, 749 F. Supp. 2d 281, 298 (E.D. Pa. 2010) ("A
temporary reassignment does not constitute ... an adverse
employment action." (citations omitted)).

The log-in issue is not an adverse employment action.
Rather, this was a quickly remedied administrative snafu due to
Plaintiff being transferred from leave to active status.
Because of this quick fix, Plaintiff cannot demonstrate that
this minor issue was materially adverse or caused harm to
Plaintiff.

As for the change in holiday schedule, it is undisputed
that Plaintiff received the same number of holidays off as she
had anticipated.  The question is whether the change in those
holidays she had off constitutes an adverse employment action.
Plaintiff does not allege that she had less desirable holidays
off, just that it is not the ones she had anticipated having
off.  As such, this was not a materially adverse change.

Because this Court has determined that none of these
alleged incidents constitute an adverse employment action under
the circumstances as alleged, the Court will proceed in its

analysis of Plaintiff's retaliation claims limited to her termination as the retaliatory act.

### iii. Non-Discriminatory Explanation for Plaintiff's Termination

Defendant explains that Plaintiff was terminated due to "two serious patient neglect incidents occurring in April 2021 and Plaintiff's refusal to follow a doctor's directive." (ECF 40-1 at 31). This includes refusing a directive to administer oxygen to an audibly wheezing patient. (Id. at 32). Defendant avers that there is no evidence that these stated reasons for her termination were pretextual. (Id. at 31). Rather, Defendant elaborates that "[f]ive members of a panel reviewed the incidents and unanimously agreed that termination was proper." (Id.).

Plaintiff asserts that the rationale for her termination is pretextual. She states that one of the reasons Defendant proffered for her termination was her "allegedly turning away patients." (ECF 45 at 29). Plaintiff avers that not only did she not do so, but that this is "an *extremely common* practice" at Inspira. (Id.) (emphasis in original). Plaintiff points to another employee who turned patients away without being seen who was disciplined on at least four occasions before she was ultimately terminated. (Id. at 29–30). Plaintiff alleges that this employee, who "*does not suffer from disabilities*" received

"***two verbal counselings, a written warning, and a suspension***."
(Id.) (emphasis in original).  Plaintiff avers that her actions
were reasonable and should have resulted in lesser disciplinary
action rather than termination.  (Id. at 30).

Defendant responds that the circumstances of this other
employee are not comparable to Plaintiff's based on the
"seriousness" of the conduct.  (ECF 46 at 13).  Unlike the other
employee, "Plaintiff was presented with a patient in actual
respiratory distress *and refused two directives from a doctor to
administer oxygen*."  (Id. at 13-14).  They are also distinct
because Plaintiff was employed as a nurse, whereas the other
employee was a clinical technician.  (Id. at 14).  As for
Plaintiff's argument that her actions were reasonable and should
have resulted in lesser discipline, Defendant asserts that
"[m]erely disagreeing with the decision and claiming the
employer was wrong does not establish pretext."  (Id.).

Plaintiff further argues that the circumstances of her
termination "are also highly suspicious."  (ECF 45 at 30).  She
alleges that although she was suspended pending an
investigation, her termination notice was drafted the same day
of her suspension and before her supervisor met with her.
Plaintiff avers that she is the only employee that this
supervisor ever terminated without first providing another type
of formal disciplinary action, contrary to the "typical

progressive disciplinary policy, which includes education, verbal counseling, written warnings, performance improvement plans, and suspensions before termination."  (Id. at 30-31). Finally, Plaintiff explains that Defendant first offered for her to resign rather than be terminated, stating that she would be eligible to be paid for her 147 hours of accrued paid time off if she resigned instead.  (Id. at 31).

Defendant explains that after the termination notice was drafted it needed to be reviewed and approved by human resources as the next step of the investigative process, and after that it was reviewed by a review panel.  (ECF 46 at 15).  The panel then ultimately agreed to terminate Plaintiff.  (Id.).  Defendant explains that it was "not obligated to follow progressive discipline as it had discretion to immediately terminate." (Id.).  Defendant explains that progressive discipline was not used here where Plaintiff "*refused to provide emergency care to a patient*."  (Id. at 16).

Plaintiff points to alleged factual disputes, specifically questioning the credibility of the testimony of two witnesses about harassment complaints against Pecora, Plaintiff's medical conditions, and the timing of the decision to terminate Plaintiff.  (ECF 45 at 32).  Plaintiff proposes that these credibility issues could cause a jury to "disbelieve their stated reasons for terminating Ms. Williams."  (Id. at 33).

Defendant responds that "[n]one of Plaintiff's arguments on credibility raise a genuine issue of material fact regarding the facts giving rise to Plaintiff's termination, which facts are undisputed.  Indeed, the critical undisputed issue is not just Robbins, but rather a panel of numerous individuals unanimously agreed that the actions Plaintiff engaged in—and which she does not deny—justified termination."  (ECF 46 at 17).

While Plaintiff seeks to undermine the stated reasons for her termination, in order to establish retaliation Plaintiff must demonstrate that the stated reasons were pretextual and the actual reason was discriminatory.  She must draw a connection between her protected action or her protected status and her termination.  Thus, this Court will discuss each of Plaintiff's retaliation claims and whether she has established a connection.

### iv. Causation and Pretext

#### 1. Title VII and NJLAD Sex Based Retaliation

Defendant asserts that Plaintiff has not established causation.  (ECF 40-1 at 28).  First, Defendant explains that the timing of the alleged adverse actions does not suggest retaliation.  (Id.).  Plaintiff engaged in a protected activity on July 3, 2020.  (Id.).  Plaintiff was terminated nine months after the protected activity, on April 21, 2021.  (Id.).  Second, Plaintiff has not pointed to any other indications of causation, and instead Defendant points to Plaintiff's statement

that "I do believe you have done everything in your power in my perception that you could do to minimize' being 'victimized over and over again.'" (Id. at 29-30).

Plaintiff asserts that her termination was "within just *two weeks* of her most recent objection to the hostile work environment." (ECF 45 at 29). Plaintiff points to an alleged history of conduct from Pecora that he was not disciplined for. ECF 45 at 32). Plaintiff avers that "the jury could interpret Defendant's lack of an appropriate response as evidence of their own impermissible animus towards such concerns, establishing both causation and pretext." (Id.). Defendant argues that Plaintiff has not pointed to any connection between her complaint or any other alleged complaints and her termination. (ECF 46 at 16).

Although Plaintiff makes arguments as to why she disagrees with Defendant's decision to terminate her, she fails to draw a connection between her complaints of sexual harassment and her termination. First, her formal complaint occurred nine months before she was terminated. (See ECF 40-2 and 45-2 at ¶¶ 9, 113). Second, Pecora resigned in December 2020, so there were no further scheduling issues at the time of her termination. (See Id. at ¶¶ 29).

Finally, while Plaintiff advises that she continued to complain about having to work at the Tomlin Station location,

and that her most recent complaint was just two weeks before her termination, this argument is too attenuated to establish retaliation.  Defendant was up front in its explanation that it agreed that Plaintiff would not be staffed with Pecora again, but that she may still be required to work at the Tomlin Station location when he was not working.  By the time of Plaintiff's termination, Pecora had no longer been working at Inspira for approximately three months.  Thus, in assigning her to work at the Tomlin Station location, it is undisputed that she was not staffed with Pecora.

While Plaintiff disagrees with Defendant's decision to still staff her at the Tomlin Station location, Defendant explains that it is part of the job description to have flexibility to work at various locations and it stated at the time of its investigation into Plaintiff's harassment that it would still staff her at this location.  Thus, Plaintiff's argument that her continued complaints about the handling of her harassment complaint nine months prior demonstrates that her termination was in retaliation for her protected activity in reporting harassment is unavailing.  Defendant did not act unreasonably in continuing to assign Plaintiff to work at the Tomlin Station location under the specific circumstances of this case.  Thus, Plaintiff's continued complaining about having to work at this location is not protected activity.  Moreover, the

two week gap between her complaining about having to work at
Tomlin Station and her termination, understanding that Plaintiff
had been continuously complaining about this, is not enough to
establish pretext.  This count will be dismissed.

### 2. ADA and NJLAD Disability Based Retaliation

Defendant argues that "Plaintiff did not contend her
termination was based on any disability during her deposition,
and yet now for the first time she does so in contradiction to
her deposition testimony.  However, even had Plaintiff
identified her termination as an adverse action taken because of
her disability, there is no evidence that Defendant's stated
reason for this action was pretextual."  (ECF 46 at 18).

Plaintiff does not point to any support for her argument
that her termination was based on her alleged disability.  As
such, she has not carried her burden of production in refuting
Defendant's non-retaliatory explanation.  This count will
therefore be dismissed.

### 3. FMLA Retaliation

Defendant advises that Plaintiff cannot establish
causation, "where the termination occurred more than four months
after the leave request" and Defendant's reasons for the
termination were not pretextual.  (Id.).

Plaintiff argues that the timing of her termination is
suggestive of retaliation, as it occurred "within just one month

of her return from medical leave." (ECF 45 at 28-29).

Defendant responds that the protected activity involved here is taking the medical leave, not returning from it. (ECF 46 at 11). Thus, the relevant date is that date she requested her FMLA leave, which was December 17, 2020 at the latest. (Id.).

Regardless of whether you count from the date of her leave request or the date she returned from leave, Plaintiff's termination was not so close in time, within the greater context of the facts of this case, so as to raise an inference of pretext. Plaintiff has not pointed to any other connection between her termination and her FMLA leave. Thus, as a matter of law, Plaintiff has not carried her burden in demonstrating an FMLA retaliation claim. This count will be dismissed.

### F. Disability Discrimination

Plaintiff asserts claims of disability discrimination pursuant to the ADA and NJLAD. Courts analyze claims for disability discrimination under the McDonnell Douglas burden-shifting framework, set out in the retaliation section above.

Disability discrimination claims under the ADA and the NJLAD are analyzed under the same framework. Guarneri v. Buckeye Pipe Line Services Co., 205 F.Supp.3d 606, 614 (D.N.J. 2016). To state a prima facie cause of action for disability discrimination, the employee must show the following: (1) the employee was disabled; (2) she is otherwise qualified to perform

the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  Id.  Disability discrimination encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities.  Taylor v. Phoenixville School Dist., 184 F.3d 296, 305–06 (3d Cir. 1999) (discussing ADA); Gavin v. Haworth, Inc., 2016 WL 7325474, at *6 (D.N.J. 2016) (discussing NJLAD).

Defendant first, in a footnote, notes that Plaintiff cannot establish the first two elements.  (ECF 40-1 at 34).  Defendant states that she has not put forth sufficient proofs that she has a qualifying disability. (Id.).  In addition, Defendant claims that to the extent Plaintiff asserts she was unable to work in the hospital, Plaintiff has not demonstrated that she is able to perform the essential functions of her job, as ability to work at other locations is an essential function of the job.  (Id.).

Defendant again explains that most of the alleged discriminatory acts do not constitute an adverse employment action, and have non-pretextual explanations. (Id.).  Defendant avers that Plaintiff did not assert a connection between her disability and her termination, but that to the extent it must

58

be addressed reiterates that the termination had a non-discriminatory basis.  (Id. at 36).

As explained above, the standard for establishing an adverse action is "lower for a retaliation claim than for a disparate treatment claim."  McKinnon, 642 F. Supp. 2d at 426 (quoting Flynn, 620 F. Supp. 2d at 490).  As such, this Court relies on its discussion above of what constitutes an adverse employment action, and will accordingly limit this discussion to Plaintiff's termination.  Again, as discussed above, Plaintiff has not demonstrated any connection between her alleged disability and her termination.  Accordingly, Plaintiff's disability discrimination claim will be dismissed.

**VII.  LEGAL STANDARD FOR MOTION TO SEAL**

Local Civil Rule 5.3 has several requirements that the Parties must address for a court in this District to restrict public access to court documents:

> (a) the nature of materials or the proceedings at issue;
>
> (b) the legitimate private or public interest which warrants the relief sought;
>
> (c) the clearly defined and serious injury that would result if the relief sought is not granted;
>
> (d) why a less restrictive alternative to the relief sought is not available;
>
> (e) any prior order sealing the same materials in the pending action; and

>   (f) the identity of any party or nonparty
>   known to be objecting to the sealing
>   request.

L. Civ. R. 5.3(c)(2).  The party moving to seal must submit a

proposed order that contains proposed findings of fact and

conclusions of law.  Id.

     The Court notes that while litigants have an interest in

privacy, the public also has a right to obtain information about

judicial proceedings.  In re Avandia Mktg., Sales Practices &

Prods. Liab. Litig., 924 F.3d 662, 670-74 (3d Cir. 2019).  When

discovery materials are filed as court documents, a more

rigorous common law right of access is applied.  Id. at 670.

"In addition to recognizing fewer reasons to justify the sealing

of court records, the public right of access — unlike a Rule 26

inquiry — begins with a presumption in favor of public access."

Id.  To rebut the presumption of public access, "the party

seeking confidentiality must demonstrate good cause by

establishing that disclosure will cause a clearly defined and

serious injury to the party seeking closure."  Boehringer

Ingelheim Pharma GmbH & Co. v. Mylan Pharms., No. 14-4727, 2015

WL 4715307, at *2 (D.N.J. Aug. 7, 2015) (quoting Publicker

Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984))

(internal quotations omitted).  "'Broad allegations of harm,

unsubstantiated by specific examples or articulated reasoning,'

do not support a good cause showing."  Id. (quoting Cipollone v.

Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986), cert. denied, 484 U.S. 976 (1987)).

### VIII.   DISCUSSION OF MOTION TO SEAL

Plaintiff avers in her Motion to File Documents Under Seal that the documents she seeks to seal are subject to a Discovery Confidentiality Order issued by the Honorable Sharon A. King, the United States Magistrate Judge to whom this matter was referred for pre-trial management.  (ECF 50 at p. 4 ¶ 2).  The Confidentiality Order "permitted the parties to mark certain sensitive documents as 'CONFIDENTIAL' and required that any parties seeking to file such documents do so under seal." (Id.).  Plaintiff attached certain of these confidential documents as exhibits to her Response to Defendant's Motion for Summary Judgment.  (Id. at 5 ¶ 5).  Plaintiff filed her Response under temporary seal.  (See ECF 45).  Plaintiff now seeks to permanently seal the confidential documents attached as exhibits, noting that they are exhibits F, H, I, K, L, O, R. (ECF 50 at p. 5 ¶ 6).

Although the documents sought to be sealed are the subject of a Confidentiality Order issued by Judge King that specifically states that such documents should be filed under seal if such documents were filed, such protection during the duration of discovery does not necessarily extend throughout the entire life of a case.  Even where a document is subject to a

protective order, when it is filed as part of a non-discovery motion the party seeking to seal the document must comply with Local Civil Rule 5.3.  Under Rule 5.3(c)(2), a party seeking to seal documents must show: (a) the nature of the materials at issue; (b) the legitimate private or public interests which warrant the relief sought; (c) the injury that would result if the relief sought is not granted; and (d) why a less restrictive alternative to the relief sought is not available.  L. Civ. R. 5.3(c) (5).  In turn, any order or opinion on a motion to seal must make findings as to these factors.

Documents filed with the Court or utilized in connection with judicial proceedings are part of the public record with a presumptive right of public access.  Leucadia v. Applied Extrusion Tech., Inc., 998 F.2d 157, 164 (3d Cir. 1993).  This is true even if the parties enter into a confidentiality agreement during discovery, even one approved by a Magistrate Judge.  Thus, when a party files a motion to seal, especially in conjunction with making or opposing a dispositive motion, that party must demonstrate that good cause exists for continuing protection of the material at issue.  Securimetrics, Inc. v. Iridian Techs., Inc., 2006 WL 827889, at *2 (D.N.J. Mar. 30, 2006).  A party demonstrates good cause by making a "particularized showing that disclosure will cause a 'clearly defined and serious injury to the party seeking closure.'"  Id.

(quoting Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994)).

Plaintiff here relied solely on the fact of the protective order in support of her assertion that the noted exhibits should be sealed.  That reliance is misplaced.  Plaintiff failed to demonstrate good cause or make a particularized showing of serious injury.  Therefore, this Court will deny Plaintiff's Motion to Seal without prejudice.  However, this Court, in its discretion, will allow Plaintiff the opportunity to remedy this defect and provide explanation for why these documents should be sealed.

The portion of Plaintiff's filing that Plaintiff has not sought to seal, including her brief and other exhibits, will be unsealed.

IX.  **CONCLUSION**

For the reasons set forth above, Plaintiff's Motion to File a Sur-Reply will be denied, Defendants' Motion for Summary Judgment will be granted, and Plaintiff's Motion to Seal will be denied without prejudice.

An appropriate Order follows.

Date: October 31, 2023         s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.